UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION


SHIRLEY M. STEVENSON,            )
                                 )
                Plaintiff,       )
                                 )
        v.                       )      No.  1:05CV184 JCH
                                 )                    (FRB)
JO ANNE B. BARNHART,[1]          )
Commissioner of Social Security, )
                                 )
                Defendant.       )


**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

        This cause is before the Court on plaintiff's appeal of
an adverse ruling of the Social Security Administration.  All
pretrial matters were referred to the undersigned United States
Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate
disposition.

**I.  Procedural History**

        On December 1, 2003, plaintiff Shirley M. Stevenson filed
an application for Disability Insurance Benefits pursuant to Title
II, 42 U.S.C. §§ 401, et seq., in which she alleged that she became
disabled on October 27, 1999.  (Tr. 58-64.)  On initial considera-
tion, the Social Security Administration denied plaintiff's claim
for benefits.  (Tr. 19, 39-43.)  On December 17, 2004, upon

_____

        [1]Michael J. Astrue became Commissioner of Social Security on
February 12, 2007.  Pursuant to Rule 25(d)(1) of the Federal Rules
of Civil Procedure, Michael J. Astrue should be substituted,
therefore, for Former Commissioner Jo Anne B. Barnhart as proper
party defendant in this cause.

plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ). (Tr. 394-438.) Plaintiff testified and was represented by counsel. Plaintiff's spouse also testified at the hearing. On May 26, 2005, the ALJ issued a decision denying plaintiff's claim for benefits. (Tr. 8-18.) On August 17, 2005, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 3-6.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Plaintiff's Testimony</u>

At the hearing on December 17, 2004, plaintiff testified in response to questions posed by the ALJ and counsel. Plaintiff is forty-eight years of age. (Tr. 397.) Plaintiff is married and lives in her home with her spouse. (Tr. 397-98.) Plaintiff completed the ninth grade in high school and subsequently obtained a GED. Plaintiff stands five-feet, four inches tall and weighs 224 pounds. (Tr. 399.)

From 1976 to 1991 and from 1994 to 1999, plaintiff worked as a certified nursing assistant (CNA) in hospitals and nursing homes. (Tr. 113.) From 2001 through March 2004, plaintiff was self-employed, babysitting her twin grandchildren in her home. (Tr. 113, 118, 405, 408.) Plaintiff testified that her husband helped with the babysitting services and that she received payment from the State for this work through June 2004. (Tr. 406, 409-10.)

Plaintiff testified that she has degenerative disc disease, ulcerated colitis, high blood pressure, plantar fasciitis, and knee pain which prevent her from performing any work activities inasmuch as the pain prevents her from completing an eight-hour workday. (Tr. 399-400, 424.) Plaintiff testified that she is unable to perform her previous work as a CNA or in home health care because of pain in her back and legs, and because of her inability to perform the required lifting, bending, sweeping, and mopping. (Tr. 414.)

Plaintiff testified that her doctors have informed her that her degenerative disc disease has resulted in a bulging disc in her lower back with such disc butting against a nerve causing pain throughout her back, leg and foot. (Tr. 400-01.) Plaintiff testified that she underwent fusion surgery for her back condition in October 1999 which provided some relief, but that she was unable to return to work as a CNA thereafter because of continued limitations in bending, stooping and walking. (Tr. 401-04.) Plaintiff testified that her back continued to worsen while she performed babysitting services and that she stopped babysitting in March 2004. (Tr. 404-05.) Plaintiff testified that her physician recommended therapy for her back condition and wanted her to undergo such therapy before considering additional surgery. (Tr. 410-11.)

Plaintiff testified that ulcerated colitis is an

inflammation of the colon and that such condition causes her to have diarrhea or constipation, and to occasionally have severe stomach pain. (Tr. 411.) Plaintiff testified that she experiences exacerbations of the condition every three to six months but that a recent colonoscopy showed her condition to have improved some. (Tr. 411-12.) Plaintiff testified that she takes medication for the condition. (Tr. 412.)

Plaintiff testified that she also suffers from plantar fasciitis which affects her left foot between the arch and the bottom of her foot. Plaintiff testified that she wears a splint at night to keep the tendon straight. Plaintiff testified that she also has orthotics which she wears in her shoes for the condition but that she nevertheless continues to experience pain. (Tr. 412-13.)

As to her daily activities, plaintiff testified that she generally is up, down and lies around. (Tr. 415.) Plaintiff testified that she wakes at approximately 8:00 or 9:00 a.m., takes care of her personal hygiene, and then goes to the kitchen to prepare breakfast for herself. (Tr. 414-15.) Plaintiff testified that she then takes her medicine and sits. Plaintiff testified that she gets up if she needs to fold laundry, or needs to sweep or mop. (Tr. 415.) Plaintiff testified that she experiences back pain with any housework. (Tr. 419-20.) Plaintiff testified that she then sits again and sometimes becomes sleepy because of her

- 4 -

medication.  Plaintiff testified that she sleeps for a while, and then gets up to cook if she has to.  (Tr. 415.)  Plaintiff testified that her husband performs most of the sweeping, mopping and cleaning.  Plaintiff testified that her husband also does the washing and the cooking.  (Tr. 409-10.)  Plaintiff testified that she leaves the home only to go to the grocery store or to the doctor, and that she is able to go to such places alone.  Plaintiff also testified that she attends church services three times a week for a total of five hours each week.  Plaintiff testified that if she needs to travel long distances, such as thirty miles, she will have someone drive her.  (Tr. 415-16.)

As to her exertional capabilities, plaintiff testified that she can stand thirty-five to forty-five minutes and then begins to experience pain in her hip which radiates down.  (Tr. 417.)  Plaintiff testified that she can sit for one hour but experiences numbness in her left leg if she sits for a longer period. (Tr. 418-19.)  Plaintiff testified that her physician has instructed her to elevate her legs while she sits.  (Tr. 420.)  Plaintiff testified that she experiences constant pain in her back and that she takes Ultracet and Vicodin for the pain.  (Tr. 417-18.)  Plaintiff testified that she also takes antidepressants for pain and as a sleep aid.  (Tr. 423.) Plaintiff testified that she has problems walking because of her foot condition and radiating back pain.  (Tr. 420.)  Plaintiff testified that she has fallen

four times during the previous year. (Tr. 421.) Plaintiff testified that she lies down two times during the day and naps every day. (Tr. 419.)

B. <u>Testimony of Plaintiff's Spouse</u>

Charles Stevenson, plaintiff's spouse, testified at the hearing in response to questions posed by the ALJ and counsel. Mr. Stevenson testified that he and plaintiff have been married for thirty-two years and have children and grandchildren together. (Tr. 429.) Mr. Stevenson testified that plaintiff was first injured in 1990 and became unable to work after she had surgery. (Tr. 429-30.) Mr. Stevenson testified that plaintiff attempted to work in home health care but was unable to do so, and that she then worked as a care provider for approximately one year watching her grandchildren who were two years old at the time. Mr. Stevenson testified that he sometimes helped watch the grandchildren if he was around, but that another daughter (the children's aunt) would help plaintiff. (Tr. 430.) Mr. Stevenson testified that plaintiff has been unable to care for the grandchildren since the first of the year. (Tr. 431.)

Mr. Stevenson testified that plaintiff engages in little activity at home and that she always complains that she is hurting. Mr. Stevenson testified that plaintiff sometimes tries to clean but that he mostly does things to help her. (Tr. 431.) Mr. Stevenson testified that plaintiff has difficulty with her balance and that

she has fallen several times.  (Tr. 432.)  Mr. Stevenson testified that he last saw plaintiff fall in May or June 2004.  (Tr. 433.)

Mr. Stevenson testified that plaintiff lies around during the day.  Mr. Stevenson testified that plaintiff may try to cook something, but then takes her medication because of pain and goes to bed.  Mr. Stevenson testified that plaintiff's right foot swells when she attempts to do any activity.  (Tr. 433.)  Mr. Stevenson testified that he does not attend church with plaintiff but that he or his daughter accompany plaintiff to the store.  (Tr. 433-34.)  Mr. Stevenson testified that plaintiff attends church services three times a week.  (Tr. 434.)

Mr. Stevenson testified that with his employment, he works twelve-hour shifts, fourteen days a month.  (Tr. 431-32.)

### III.  Medical Records

On June 21, 1998, plaintiff underwent x-rays of her lumbosacral spine in response to her complaints of cramping in her right leg.  The results of the x-rays were negative.  (Tr. 350.)

Plaintiff visited Dr. Thomas Waltrip on June 22, 1998, who noted plaintiff's visit to the emergency room the previous day. Plaintiff complained to Dr. Waltrip that she experiences pain in her right leg and that the leg goes numb when she walks.  Plaintiff reported that her leg tingles when she sits and hurts when she does any activity.  Plaintiff reported that she also began experiencing back pain a week prior and that such pain radiated down her right

leg during the week. Plaintiff reported the pain to be a shooting
pain. (Tr. 300.) Physical examination showed the lumbar area to
be tender with some lordosis, as well as tenderness in the
sacroiliac joint area. (Tr. 300-01.) Forward bending was normal.
Twisting the left leg to the left caused pain. Rotating the right
leg caused pain. Plaintiff experienced pain in her right foot when
she tried to heel walk. Tandem walking was normal. Squatting
caused pain on the right. Straight leg raising was negative on the
left and positive on the right. (Tr. 300.) No paralysis was
noted. Plaintiff had good range of motion of the hips. Plaintiff
experienced pain with motion of the knee. (Tr. 301.) Pedal pulses
were noted to be "pretty good." Plaintiff reported the bottom of
her right foot to feel numb and cold. It was noted that plaintiff
was given Norgesic Forte[2] and a Toradol[3] injection in the emergency
room. Plaintiff was diagnosed with radicular syndrome and was
prescribed Relafen[4] and Medrol Dose Pack.[5] Bed rest was ordered for

---

[2]Norgesic Forte is indicated for the symptomatic relief of
mild to moderate pain of acute musculoskeletal disorders.
Physicians' Desk Reference 1806 (55th ed. 2001).

[3]Toradol is indicated for the short-term management of
moderately severe acute pain that requires analgesia at the opioid
level. Physicians' Desk Reference 2789-91 (55th ed. 2001).

[4]Relafen is indicated for acute and chronic treatment of signs
and symptoms of osteoarthritis and rheumatoid arthritis.
Physicians' Desk Reference 3120-21 (55th ed. 2001).

[5]Medrol relieves inflammation (swelling, heat, redness, and
pain) and is used to treat certain forms of arthritis, skin and
kidney disorders, and severe allergies. Medline Plus (last revised
Apr. 1, 2003)<http://www.nlm.nih.gov/medlineplus/druginfo/

two days.  (Tr. 301.)  X-rays taken of plaintiff's right knee on June 25, 1998, were negative.  (Tr. 349.)

Plaintiff returned to Dr. Waltrip on June 26, 1998, for follow up on both legs.  Plaintiff reported that bed rest helped her back pain but not the condition in her legs.  Plaintiff reported her left foot to feel warmer than the right.  Forward bending and all motion tests were normal.  Straight leg raising was negative on the left and positive on the right with back pain.  Dr. Waltrip suspected herniated nucleus pulposus (HNP).  (Tr. 302.)

An MRI of plaintiff's lumbar spine taken on June 29, 1998, in response to plaintiff's complaints of back and right leg pain showed disc degeneration and disc dehydration at L4-L5 and T11-T12, with a minimal bulging disc at L4-L5.  (Tr. 348.)

Plaintiff followed up with Dr. Waltrip on July 6, 1998, and reported that she experiences less pain if she stays off of her feet.  Results of the MRI were noted.  Plaintiff reported there to be numbness and tingling in her leg which bothers her more after bending or lifting.  Plaintiff also reported that she experiences numbness when she sits and lets her legs hang down.  Physical examination showed tenderness over the lumbar spine.  Straight leg raising caused a tremor, muscle tightness and charley horse on the right.  Plaintiff had good range of motion of her back.  Plaintiff experienced a burning sensation in her right foot upon range of

---

medmaster/a682795.html>.

motion testing. It was noted that plaintiff had been taking Lorcet[6] as prescribed by Dr. Tellow. Dr. Waltrip diagnosed plaintiff with degenerative disc disease and bulging lumbar disc. Dr. Waltrip questioned whether plaintiff had radiculopathy and neuropathy. (Tr. 303.)

On November 19, 1998, plaintiff visited Dr. R. August Ritter at Orthopaedic Associates and complained of an exacerbation of back pain upon lifting a patient at work. Plaintiff reported that she took Ibuprofen and Excedrin which helped the pain. Physical examination showed plaintiff to have excellent range of motion. Some tenderness was noted with the paraspinous muscle in the right SI region upon palpation. Dr. Ritter diagnosed plaintiff with degenerative disc disease of the lumbar spine with chronic intermittent low back strain/sprain. Dr. Ritter instructed plaintiff to continue with full activities and further instructed that plaintiff continue her self-treatment for intermittent flare ups and to follow up with him if such treatment was not adequate. (Tr. 165.)

Plaintiff visited Dr. Raymond A. Ritter, Jr., on February 2, 1999, and complained of low back pain, discomfort in her right leg and some burning pain in her right foot. Straight leg raising was negative. A little tenderness was noted about the low lumbar

_____

[6]Lorcet contains hydrocodone and acetaminophen to relieve moderate to moderately severe pain. Medline Plus (last revised May 1, 2005)<http://www.nlm.nih.gov/medlineplus/druginfo/drugmaster/a601006.html>.

area.   Flexion was noted to be mildly restricted.   Dr. Ritter prescribed Naprosyn[7] and Darvocet[8] for plaintiff.   Plaintiff was instructed to continue working and to return in two months for follow up.  (Tr. 165.)

On March 22, 1999, plaintiff visited Dr. Waltrip for a check up on her blood pressure and for complaints of pain. Plaintiff complained of experiencing constant back pain on the right side for two months and that she could not lie on the right side.   Plaintiff reported minimal pain with bending forward and side-bending, and no pain with backward bending.   No weakness or paralysis was noted.   Plaintiff reported that she takes Naprosyn for her back pain as prescribed by Dr. Ritter.   Plaintiff reported that she takes care of two grandchildren, ages three and six, and that they live with her.   It was noted that plaintiff was a little anxious and nervous, and Zoloft[9] was prescribed.  (Tr. 298.)

On April 5, 1999, plaintiff returned to Dr. Waltrip for follow up of her blood pressure and right-sided pain.   Plaintiff reported the pain to have somewhat improved but that she still could not lie on her right side.   Plaintiff reported Excedrin to

---

[7]Naprosyn is indicated for the treatment of rheumatoid arthritis, osteoarthritis and ankylosing spondylosis. <u>Physicians' Desk Reference</u> 2744-45 (55th ed. 2001).

[8]Darvocet is indicated for the relief of mild to moderate pain.  <u>Physicians' Desk Reference</u> 1708-09 (55th ed. 2001).

[9]Zoloft is indicated for the treatment of depression. <u>Physicians' Desk Reference</u> 2553-54 (55th ed. 2001).

help the pain but that sometimes the pain could be at a level ten on a scale of one-to-ten. Physical examination showed no pain upon bending. Plaintiff experienced pain only upon lying down. It was noted that plaintiff was "real tender" when Dr. Waltrip pressed and that it was tender to breathe if she was lying down. Mild upper quadrant tenderness was also noted. Dr. Waltrip diagnosed plaintiff with mid-neck pain and instructed plaintiff to return in one to two weeks. (Tr. 296.)

Plaintiff returned to Dr. Waltrip on April 23, 1999, for follow up of pain in her side. Plaintiff reported the pain not to be "so bad now." (Tr. 295.) Dr. Waltrip noted recent chest x-rays to show an enlarged heart. Plaintiff was diagnosed with hypertension and enlarged heart. Plaintiff was instructed to continue with Zestoretic[10] and Zoloft. (Tr. 294-95.)

Plaintiff returned to Dr. Waltrip on May 26, 1999, and complained of having constant pain all over. Plaintiff reported that she was doing okay but was tired. It was noted that plaintiff had been diagnosed with ulcerated colitis in 1992. Plaintiff reported that she had pain in her knees the previous day but that there was no swelling. Plaintiff reported her mood to be okay and that her spirits were fine. Plaintiff was instructed to take Zoloft every day. (Tr. 291.)

On August 16, 1999, plaintiff visited Dr. Waltrip and

---

[10]Zestoretic is indicated for the treatment of hypertension. Physicians' Desk Reference 652 (55th ed. 2001).

complained that there had been no change in her back condition. Plaintiff reported that her medication, Celebrex,[11] was expensive. Plaintiff reported that she continued to work but that she was not bending or lifting. Plaintiff reported that she continues to hurt, but that such pain is not as bad when she does not do anything. Plaintiff reported that she has needle-like sensations in her right leg. Plaintiff also reported that she feels weak and that her hips hurt. Physical examination showed tenderness along the muscles about the spine. Plaintiff reported that she did not want any stronger medication for pain. It was noted that plaintiff's prescription for Zoloft needed to be refilled. Toe walking and heel walking were noted to be okay. Plaintiff was diagnosed with low back pain and hypertension. Plaintiff was instructed to take Pamelor[12] at night and to participate in physical therapy two or three times a week. Plaintiff was also instructed not to engage in any bending or lifting. (Tr. 292.)

On September 3, 1999, plaintiff reported to Dr. Waltrip that she had been attending therapy and that her back was doing okay. Plaintiff reported that she experiences pain with lifting

_____

[11]Celebrex is indicated for signs and symptoms of osteoarthritis and rheumatoid arthritis. Physicians' Desk Reference 2986 (55th ed. 2001).

[12]Pamelor (Nortriptyline) is an antidepressant used to treat depression, but may also be used to treat panic disorders, chronic pain and premenstrual depression. Medline Plus (last revised Apr. 1, 2005)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/ a682620.html>.

- 13 -

and that she continues to experience tingling in her right leg and thigh. Physical examination showed no pain with front, back or side-bending, or with rotation. Plaintiff's heel and toe walking were satisfactory and her tandem walking was noted to be okay. Plaintiff reported that she takes all of her medications. Plaintiff reported that she walks all day at work and that she could not keep her job if she could not bend or lift. Dr. Waltrip diagnosed plaintiff with low back pain and instructed plaintiff to continue with physical therapy. Plaintiff was instructed to discontinue Celebrex and was prescribed Skelaxin.[13] Plaintiff was also instructed to continue with Zoloft. (Tr. 293.)

Plaintiff's appointment with Dr. Waltrip scheduled for September 22, 1999, was cancelled. (Tr. 287.)

Plaintiff visited St. Francis Medical Center on September 30, 1999, and complained of nearly constant pain in her right leg and back. Plaintiff reported the pain to radiate to her right hip and to radiate down to her big toe. Plaintiff reported that any kind of activity, including lifting and walking, exacerbated the pain. Plaintiff reported that sitting and lying down improves her symptoms. Neurosurgeon Dr. Kee B. Park noted plaintiff's medical history to include ulcerative colitis, and that plaintiff's current medications were Zestoretic, Zoloft and Nortriptyline. (Tr. 148.)

_____

[13]Skelaxin is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions. Physicians' Desk Reference 1080 (55th ed. 2001).

Physical examination showed full muscle strength in all extremities. Plaintiff had normal gait and station. Dr. Park noted plaintiff to have normal tone with no atrophy or fasciculations. (Tr. 149.) Deep tendon reflexes were noted to be 2+ throughout. Dr. Park noted the MRI from June 1998 which showed a degenerated disc at L4-5 with minimal bulging. Dr. Park suspected such disc degeneration to cause plaintiff's intractable back pain. A lumbar discogram ordered by Dr. Park showed no definite abnormality at the L3-4 level, but findings consistent with an annular tear or herniation at the L4-5 level were noted. (Tr. 146-47, 149.) Upon viewing the results of the discogram, Dr. Park recommended that plaintiff undergo diskectomy, interbody cage placement and posterior facet fusion at L4-L5. (Tr. 138.) Plaintiff underwent such surgery on October 27, 1999. (Tr. 139-41.)

On November 29, 1999, plaintiff reported to Dr. Park that her back pain had improved and that the pain in her right leg was gone. Dr. Park noted x-rays to show stable appearance of the interbody cages. (Tr. 136-37.)

On January 24, 2000, Dr. Park noted x-rays to show "interbody cages at L4-L5 which has returned in excellent position." (Tr. 134.) Plaintiff continued to complain of some back soreness but reported her leg pain to be much better. Dr. Park instructed plaintiff to continue to wear her back brace and to

remain off of work as a nursing assistant for another three months. (Tr. 133.)

Plaintiff's appointment with Dr. Waltrip scheduled for March 29, 2000, was cancelled. (Tr. 287.)

On April 4, 2000, plaintiff complained to Dr. Waltrip that she experienced pain in her right side above the hip bone. Plaintiff also reported that her colitis had been acting up. Plaintiff reported her hip pain not to currently be too bad, and that she no longer had leg pain since her surgery. Plaintiff reported that she was not currently participating in physical therapy for her back pain. (Tr. 287.) Dr. Waltrip diagnosed plaintiff with hypertension, degenerative disc disease, ulcerative colitis, and obesity. (Tr. 286.)

On April 24, 2000, Dr. Park noted x-rays to show "interbody fusion cages at L4-5 which appears to [be] fused solidly." No evidence of cage migration was noted. (Tr. 132.) Plaintiff reported her right leg pain to have resolved, and Dr. Park released her from his care. Dr. Park noted that "[o]verall, she has done very well." (Tr. 131.)

On April 26, 2000, Dr. Waltrip noted plaintiff to be down, blue and depressed. He instructed that plaintiff increase her dosage of Zoloft. Dr. Waltrip also instructed plaintiff to lose weight and advised that she exercise. (Tr. 286.)

Plaintiff visited the emergency room at Missouri Delta

Medical Center on May 21, 2000, after having fallen. Plaintiff reported that she had pain in her right ankle. X-rays of the right ankle showed chip fracture at the lateral aspect of the distal articular surface of the calcis with minimal separation. Calcaneal spur formation was also noted. (Tr. 238, 335-36.) X-rays of the pelvis and right hip were negative. (Tr. 239.) Plaintiff was provided a splint, crutches and ice packs, and was given Ansaid[14] and Lorcet Plus. (Tr. 236-37.) Upon discharge, plaintiff was instructed to keep her foot elevated and to apply ice to the affected area during the next twenty-four to thirty-six hours to lessen pain, swelling and bruising. (Tr. 240.)

On September 28, 2000, plaintiff visited Dr. H.L. Schneider, Jr., at Gastroenterology Associates of Southeast Missouri. Plaintiff complained of having had a flare up of her condition over the past three months. Plaintiff complained of right lower quadrant abdominal discomfort which sometimes radiates to the left. Upon physical examination, Dr. Schneider diagnosed plaintiff with left-sided ulcerative colitis with acute

---

[14]Ansaid is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. Medline Plus (last revised Jan. 1, 2006)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a687005.html>.

exacerbation.    Plaintiff  was  prescribed  Cortenema[15]  and  Asacol.[16]
Plaintiff  was  instructed  to  return  in  four  weeks.   (Tr. 151.)

On October 27, 2000, plaintiff failed to appear for a
scheduled appointment with Dr. Schneider.   (Tr. 151.)

Plaintiff  visited  the  Clinic  at  Delta  Medical  Center  on
November 13, 2000, and complained of knee pain.  (Tr. 321.)  X-rays
of the right knee showed no fracture.   A small focal lucency in the
lateral  femoral  condyle  was  observed;  however,  it  was  noted  that
such lucency was present in x-rays taken in 1998.  (Tr. 235, 321.)

On November 21, 2000, plaintiff called Dr. Schneider's
office and asked that her appointment be rescheduled.  (Tr. 151.)

Plaintiff  visited  Dr.  August  Ritter  on  December 4, 2000,
for  evaluation  of  knee  pain.    Plaintiff  reported  having  had  such
pain for one month and that Tylenol, Ibuprofen, aspirin, and heat
did  not  resolve  the  pain.    Plaintiff's  medical  history  was  noted.
Dr. Ritter noted plaintiff's current medications to be Zestoretic,
Asacol and Zoloft.   Physical examination showed plaintiff to have
good  range  of  motion  with  minimal  crepitus.    Dr. Ritter  noted  there
to be good alignment and good ligament stability with no effusion.

_____

[15]Cortenema  provides  the  potent  anti-inflammatory  effect  of
hydrocortisone  and  is  indicated  as  adjunctive  therapy  in  the
treatment  of  ulcerative  colitis.   <u>Physicians' Desk Reference</u> 3143
(55th ed. 2001).

[16]Asacol is indicated for the treatment of mildly to moderately
active  ulcerative  colitis  and  for  the  maintenance  of  remission  of
ulcerative  colitis.   <u>Physicians' Desk Reference</u> 2669-70 (55th ed.
2001).

Medial joint line pain was noted. Dr. Ritter diagnosed plaintiff with right knee pain, probable early medial compartment degenerative arthritis. Dr. Ritter determined for plaintiff to undergo an MRI after which he would conduct further examination. (Tr. 166.)

On December 11, 2000, plaintiff failed to appear for MRI imaging of the right knee as scheduled. (Tr. 167.)

On December 15, 2000, plaintiff failed to appear for a scheduled follow up visit with Dr. August Ritter regarding her right knee. (Tr. 167.)

On March 9, 2001, plaintiff visited Dr. Waltrip who noted an ultrasound to show fibroid tumors on plaintiff's ovaries. Plaintiff was cleared for surgery to correct the condition. Dr. Waltrip also noted plaintiff's ulcerative colitis. (Tr. 284.)

On July 13, 2001, plaintiff complained to Dr. Waltrip of right knee pain and swelling, swelling and tenderness of the left foot, and low back pain. Physical examination showed tenderness about the left foot and right knee. No effusion was noted. Dr. Waltrip noted plaintiff's blood pressure to be controlled. It was noted that plaintiff had no insurance and samples of medication were given. (Tr. 283.) The results of laboratory tests performed that same date were normal. (Tr. 241-42.)

On July 30, 2001, plaintiff reported to Dr. Waltrip that there was no change in the pain involving her foot and knee.

Plaintiff also reported that her feet stay swollen and that Indocin[17] does not help the condition. Dr. Waltrip instructed plaintiff to apply moist heat for her knee and foot pain. Celebrex was prescribed. (Tr. 282.)

On August 13, 2001, Dr. Waltrip noted there to be no tenderness about plaintiff's right knee but that plaintiff experienced pain to the inside of the knee. Plaintiff was instructed to have her blood sugar checked at home. It was recommended that plaintiff lose weight. Plaintiff was instructed to see Dr. Ritter. (Tr. 281.)

On October 31, 2001, plaintiff visited Dr. Hugh R. Protzel at the Foot and Ankle Center and complained of having experienced pain in the arch of her left foot for two or three months. (Tr. 163.) Dr. Protzel noted plaintiff's medications to be Zoloft and Zestoretic. Upon physical examination, which elicited pain plantarly and plantar medially bilaterally, Dr. Protzel diagnosed plaintiff with plantar fasciitis. (Tr. 162-63.)

---

[17]Indocin is an NSAID found to be effective in active stages of moderate to severe rheumatoid arthritis including acute flares of chronic disease, moderate to severe ankylosing spondylitis, moderate to severe osteoarthritis, acute painful shoulder, and acute gouty arthritis. Physicians' Desk Reference 1946 (55th ed. 2001).

Dr. Protzel injected Depo-Medrol[18] and Lidocaine[19] to the affected areas. Plaintiff was prescribed Celebrex and was instructed to return in two weeks. (Tr. 162.)

Plaintiff returned to Dr. Protzel on November 14, 2001, and continued to complain of pain and discomfort in the left heel. Dr. Protzel noted there to be severe pain upon palpation of the plantar medially. Dr. Protzel continued in his diagnosis of plantar fasciitis and re-injected Depo-Medrol and Lidocaine. Plaintiff was instructed to return in two weeks at which time Dr. Protzel planned to cast her for orthotics if there was improvement. (Tr. 161.)

On November 26, 2001, plaintiff returned to Dr. Waltrip for check up on her blood pressure. Dr. Waltrip noted plaintiff to be doing well. Plaintiff was diagnosed with knee pain, hypertension, obesity, and depression. (Tr. 280.)

On November 28, 2001, plaintiff reported to Dr. Protzel that she continued to have pain and discomfort in her left heel, although the pain had improved. Physical examination showed some pain upon palpation plantarly and plantar medially. Dr. Protzel diagnosed plaintiff with resolving plantar fasciitis and

_____

[18]Depo-Medrol is a steroid primarily used for its potent anti-inflammatory effect. Physicians' Desk Reference 2594 (55th ed. 2001).

[19]Lidocaine is indicated for relief of pain associated with post-herpetic neuralgia. Physicians' Desk Reference 1204 (55th ed. 2001).

administered another injection of Depo-Medrol and Lidocaine. Plaintiff was instructed to continue taking her anti-inflammatory medication and to continue wearing a night-splint. Dr. Protzel noted that plaintiff would be referred for therapy. (Tr. 160.)

Plaintiff returned to Dr. Protzel on January 3, 2002, and continued to complain of pain and discomfort in her heel. Palpation to the heel elicited severe pain about the plantar and plantar medially. Dr. Protzel diagnosed plaintiff with continued plantar fasciitis and determined to cast plaintiff for orthotics. Plaintiff was instructed to continue with the night-splint and to continue with her medication. (Tr. 156.) In a letter written that same date, Dr. Protzel requested that plaintiff be provided orthotic devices to relieve her symptoms of plantar fasciitis. Dr. Protzel noted in the letter that plaintiff had obtained only limited relief with cortisone injections and medication, and that, other than orthotics, surgery was the only alternative. (Tr. 159.)

On January 21, 2002, plaintiff complained to Dr. Waltrip of low back pain upon attempting to pick up her granddaughter the previous evening. No other symptoms were reported. Dr. Waltrip recommended that plaintiff avoid Celebrex due to potential stomach bleed. Dr. Waltrip recommended that plaintiff diet and exercise so that she lose weight. Plaintiff was instructed to apply heat to the affected area and to rest. Vioxx[20] was prescribed and plaintiff

---

[20]Vioxx is indicated for the relief of signs and symptoms of osteoarthritis and for the management of acute pain. Physicians'

was instructed to continue with Zoloft and other medications. (Tr. 279.)

Plaintiff received her orthotics on January 22, 2002, and was instructed to wear them in her shoes for gradually increasing periods. It was noted that after three weeks of becoming accustomed to the devices, it would take up to two months for the body to recover from the physical condition for which the orthotics were prescribed. (Tr. 157.)

On February 18, 2002, plaintiff reported to Dr. Protzel that she was wearing her orthotics full time and that she was having only occasional pain. Plaintiff was instructed to continue wearing them full time and to return to Dr. Protzel as needed. (Tr. 154.)

Plaintiff visited Dr. Waltrip on February 27, 2002, and complained of pain in her right wrist and right knee. Dr. Waltrip recommended that plaintiff take Extra Strength Tylenol and Pravachol[21] was prescribed. (Tr. 277.)

Plaintiff visited the Clinic at Delta Medical Center on March 27, 2002, and complained of pain in her right wrist. X-rays showed minimal osteoarthritis of the wrist. (Tr. 228, 330-31.)

On March 29, 2002, plaintiff returned to Dr. Waltrip and

Desk Reference 2049-50 (55th ed. 2001).

[21]Pravachol is a lipid-lowering compound which reduces cholesterol biosynthesis. Physicians' Desk Reference 1014 (55th ed. 2001).

- 23 -

complained of knee pain and foot pain. Plaintiff reported taking Tylenol for the pain. It was noted that plaintiff did not have diabetes. Dr. Waltrip noted plaintiff to be alert and friendly. Dr. Waltrip advised plaintiff to lose weight. Plaintiff was diagnosed with knee and foot pain, hypertension, and de Quervain's syndrome.[22]

On April 4, 2002, plaintiff visited Dr. Brian Schafer at Orthopaedic Associates for complaints of right wrist and knee pain. (Tr. 167-68.) Plaintiff reported to have had her wrist pain for several months and that it becomes sore with any activity and painful with grip. Plaintiff reported that she works as a babysitter. Plaintiff reported her knee pain to be a dull, aching pain with no popping, catching or locking. Plaintiff reported that the knee does not give way. Plaintiff reported experiencing pain along the medial side of the knee, especially with walking. Physical examination of the right wrist showed tenderness to palpation over the first extensor compartment. Mildly positive Finkelstein's test was noted. Otherwise, plaintiff had full range of motion, flexion extension and radial ulnar deviation. Examination of the knee showed no instability. Tenderness to palpation along the medial joint line was noted. There was no

_____

[22]De Quervain's syndrome is an inflammation which affects the sheaths of the tendons on the thumb side of the wrist. Arthritis, *De Quervain's Tenosynovitis* (Apr. 4, 2006)<http://www.mayoclinic.com/health/de-quervains-tenosynovitis/DS00692>.

tenderness with internal or external rotation of the hip. Upon review of x-rays, Dr. Schafer diagnosed plaintiff with de Quervain's tenosynovitis of the right wrist and early degenerative joint disease of the right knee. Dr. Schafer placed plaintiff's thumb in a splint and prescribed Vioxx for the wrist condition. In addition, Dr. Schafer prescribed Chondroitin and Glucosamine[23] as well as Vioxx for plaintiff's knee condition. Plaintiff was instructed to return in six weeks. (Tr. 168.)

On May 22, 2002, plaintiff reported to Dr. Waltrip that her entire body hurt. Dr. Waltrip noted plaintiff to have gained weight. Plaintiff reported that she continued to have pain in the arch of her left foot. It was noted that plaintiff had seen Dr. Protzel for her foot pain and had three cortisone injections. (Tr. 275.)

On May 23, 2002, plaintiff reported to Dr. Schafer that she continues to have pain in the right wrist but that it had improved. (Tr. 168.) Plaintiff reported that she was having some pain in the left wrist as well. Dr. Schafer injected Solu-Cortef[24] and Lidocaine to the wrists upon which plaintiff began having

_____

[23]Chondroitin and Glucosamine are used for improving symptoms and arresting the degenerative process of osteoarthritis. Medline Plus (Dec. 1, 2006)<http://www.nlm.nih.gov/medlineplus/druginfo/natural/patient-chondroitin.html>.

[24]Solu-Cortef is used to relieve inflammation associated with certain forms of arthritis. Medline Plus (last revised Apr. 1, 2003)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682871.html>.

improvement. Dr. Schafer provided plaintiff a splint for her left thumb and instructed plaintiff to continue taking Vioxx. Plaintiff was to return in six weeks for follow up. (Tr. 169.)

On July 10, 2002, plaintiff complained to Dr. Waltrip that, at times, her entire body hurts. It was noted that plaintiff had been given Vioxx and braces for her wrists. Plaintiff reported that Vioxx did not help her condition, that she stopped taking Pravachol because of muscle tenderness, and that she felt better without the medication. Plaintiff also reported that she recently fell on two occasions and that her back hurt. It was noted that plaintiff blamed her shoes for one of her falls. (Tr. 274.)

On July 17, 2002, plaintiff reported to Dr. Schafer that the condition in her right wrist had improved but that her left wrist continued to be painful. Dr. Schaefer offered surgical intervention but plaintiff stated that she would prefer to continue with the splint and medication. Plaintiff was instructed to return in six weeks if she continued to have problems. (Tr. 169.)

On July 31, 2002, plaintiff complained to Dr. Waltrip that she had pain in her legs and low back and that she hurts when she sits or lies down. It was noted that squatting caused pain in the groin area. Plaintiff reported that Salsalate[25] and Vioxx did

_____

[25]Salsalate is a salicylate which is indicated for relief of the signs and symptoms of rheumatoid arthritis, osteoarthritis and related rheumatic disorders. Physicians' Desk Reference 1800 (55th ed. 2001); Medline Plus (revised Aug. 4, 2005)<http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202515.html>.

not help the pain.  Dr. Waltrip noted Celebrex to cause bleeding.
Dr. Waltrip questioned the side effects of Pravachol.  Plaintiff
reported having fallen twice and it was noted that there had been
some bruising.  Dr. Waltrip recommended that plaintiff take baby
aspirin on a daily basis.  Plaintiff was instructed to engage in no
bending or lifting.  Plaintiff was instructed to continue with her
medication and Vicodin[26] was prescribed.  (Tr. 273.)

On August 1, 2002, plaintiff visited the Clinic at Delta
Medical Center and complained of back pain.  X-rays of the left hip
and sacroiliac joints showed no abnormality.  An x-ray of the
lumbar spine showed the presence of internal metallic devices in
the intervertebral disc space of L4-L5.  Otherwise, the vertebral
height of the lumbar spine appeared unremarkable and no obvious
compression fracture was detected.  (Tr. 220-22, 318-20.)

On August 2, 2002, plaintiff reported to Dr. Waltrip that
Vicodin helped with her back and leg pain.  (Tr. 272.)

On August 20, 2002, plaintiff visited Neurologist Dr.
Riyadh J. Tellow.  Dr. Tellow noted that two recent falls
aggravated plaintiff's back pain, which was located in the sacral
and lumbar regions, left groin and left hamstring area.  Dr. Tellow
noted there to be no weakness or numbness.  Dr. Tellow also noted
an x-ray to show a metallic device at the L4-5 level, but no
compression fracture.  Plaintiff's current medications were noted

_____

[26]Vicodin is indicated for the relief of moderate to moderately
severe pain.  Physicians' Desk Reference 1629-30 (55th ed. 2001).

to be Vioxx, Zoloft, Zestoretic, and Hydrocodone.[27]  Physical examination showed straight leg raising to produce pain on the left.  Tenderness was noted about the lumbar and sacral region, as well as in the left groin and left buttock area.  Motor examination was normal.  Deep tendon reflexes were 2+ and symmetric.  Plaintiff's gait was normal.  Plaintiff had no sensory loss or radicular distribution.  Dr. Tellow noted internal rotation of the left hip to produce minor discomfort.  Dr. Tellow determined to rule out HNP and ordered a CT scan of the lumbar spine.  (Tr. 175.)

An x-ray taken of the lumbar spine on August 21, 2002, showed minimal osteoarthritis of L3-L4.  (Tr. 218, 317.)  A CT scan taken that same date showed postoperative changes with placement of interbody caging at L4-L5 with good alignment.  The CT scan also showed, however, central and left-sided disc herniation and protrusion of L5-S1 with extension to neural foramen and obliteration of L5 nerve root on the left side.  (Tr. 219, 316.)

Plaintiff returned to Dr. Schafer on August 28, 2002, and reported that her right wrist continued to improve and that the left wrist improved as well but continues to be minimally tender.  (Tr. 169.)  Dr. Schafer again offered surgical intervention, but plaintiff requested that she continue with splints and medication.  Dr. Schafer instructed plaintiff to return in the event she decided to have the surgery.  (Tr. 170.)

_____

[27]Hydrocodone is marketed under the name of Vicodin. Physicians' Desk Reference 1629 (55th ed. 2001).

On August 29, 2002, plaintiff reported to Dr. Tellow that she had experienced a fifty-percent improvement in her back, left hip and left leg. Plaintiff reported that she was able to sit longer and walk somewhat better. Physical examination showed discomfort with straight leg raising. Dr. Tellow noted the recent CT scan to show a recurrent disc herniation at L5-S1 on the left with nerve impingement on the S1 nerve root. Plaintiff reported that she had already obtained some improvement and that she did not want to have surgery. Dr. Tellow noted plaintiff to already be taking Vioxx. Dr. Tellow added Skelaxin to plaintiff's medication regimen and instructed plaintiff to rest, apply heat, and massage the affected area through physical therapy. Plaintiff was instructed to avoid lifting or repetitive bending. Plaintiff was instructed to return in four weeks and was advised that a neurosurgical opinion would be sought if plaintiff's back pain worsened. (Tr. 174.)

On September 10, 2002, plaintiff reported to Dr. Waltrip that she continued to have back pain and that the pain was severe the previous night. Plaintiff was instructed to continue with Zoloft, Vioxx, Skelaxin, and Vicodin and to participate in rehabilitation. (Tr. 270.)

Plaintiff visited Gastroenterologist Dr. Wilfred Lee on September 16, 2002, upon referral from Dr. Waltrip. Dr. Lee noted plaintiff's past medical history and reviewed her current

medications.  Plaintiff reported that Asacol and Cortenema helped the recent exacerbation of ulcerative colitis, but that the bleeding had been very heavy a few weeks prior.  Plaintiff reported no abdominal pain.  Plaintiff was instructed to stop taking aspirin, Salicylate and Vioxx for nine days.  Plaintiff was scheduled for a colonoscopy.  (Tr. 192-96.)

On September 18, 2002, plaintiff was discharged from physical therapy for her back condition after having participated in six sessions since September 3, 2002.  It was noted that plaintiff had no pain, had recovered from her condition and that the treatment goals had been met.  Plaintiff could tolerate up to twenty minutes of walking without experiencing symptoms.  It was the physical therapist's understanding that plaintiff had returned to her full time position which she held prior to her injury. Plaintiff was instructed to continue with her home exercise program, which including walking and back protection techniques. (Tr. 180-89.)

A colonoscopy performed on September 26, 2002, showed internal and external hemorrhoids.  Medication was provided to plaintiff for the condition.  (Tr. 197.)  Biopsies of the right colon, transverse colon and left colon showed mild superficial chronic inflammation consistent with quiescent ulcerative colitis. (Tr. 198-99.)

On September 30, 2002, plaintiff returned to Dr. Tellow

and reported that her back pain was doing better. It was noted that plaintiff had participated in physical therapy for her condition. Dr. Tellow noted plaintiff's range of motion to be good and straight leg raising was normal. Dr. Tellow diagnosed plaintiff with "back pain improved" and instructed plaintiff to continue with Vioxx and Skelaxin. (Tr. 173.)

On November 25, 2002, plaintiff returned to Dr. Waltrip for follow up on her hypertension. Dr. Waltrip noted plaintiff not to be working at the time. Plaintiff was instructed to add Toradol to her medication regimen. (Tr. 268.)

On November 26, 2002, plaintiff returned to Dr. Lee and reported no change in her condition of ulcerative colitis. Dr. Lee determined to provide no treatment at the time and instructed plaintiff to call if there were a change in symptoms. Plaintiff reported that she preferred taking Asacol for the condition. Plaintiff was instructed to return in one year for follow up. (Tr. 200.)

Plaintiff visited Dr. Waltrip on January 14, 2003, and complained that her heart had been racing all of the time. Dr. Waltrip ordered a twenty-four-hour holter monitor and instructed plaintiff to resume Pravachol. Plaintiff also complained of experiencing throbbing headaches which worsen in the supine position, but reported that medication helps. Dr. Waltrip noted plaintiff's lumbar disc surgery and also that a CT scan ordered by

Dr. Tellow showed recurrent disc bulge in the lumbar area. (Tr. 266-67.) Dr. Waltrip diagnosed plaintiff with hypertension, degenerative disc disease of the spine, osteoarthritis, and headaches, questioning whether such headaches were migraines. (Tr. 266.)

Results from the holter monitoring period dated January 15, 2003, showed no clinically significant arrhythmias. (Tr. 229.)

On March 4, 2003, plaintiff complained to Dr. Waltrip that her left hand had been tingling and that her hands were swelling. Plaintiff also reported that she had been experiencing pain in the upper abdomen subsequent to a recent colonoscopy and that she hurts when she lies down. Plaintiff reported that she tries to exercise at home. Elavil[28] was added to plaintiff's medication regimen and plaintiff was instructed to continue with her other medications. (Tr. 264.)

On April 7, 2003, plaintiff reported to Dr. Waltrip that Elavil helped with her chronic pain and that Zoloft helped her as well. Dr. Waltrip instructed plaintiff to continue with her medications. (Tr. 265.)

On August 12, 2003, plaintiff reported to Dr. Waltrip that she tripped over a vacuum cleaner and fell onto a table,

---

[28]Elavil is indicated for the relief of symptoms of depression, Physicians' Desk Reference 626 (55th ed. 2001), but is also sometimes used to treat chronic pain or certain skin disorders, Medline Plus (last revised Apr. 1, 2005)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html>.

striking her left side.  Plaintiff also reported having headaches which she attributed to stress or tension.  Plaintiff reported having blood in her stool and informed Dr. Waltrip that she had an appointment with a gastroenterologist.  Plaintiff was instructed to lose weight.  (Tr. 262.)

On September 16, 2003, plaintiff reported to Dr. Waltrip that she felt good.  Plaintiff reported, however, that Pravachol and Lipitor made her feel "draggy," made her heart race, and made her muscles hurt.  No edema was noted in plaintiff's legs.  Dr. Waltrip noted plaintiff to have gained weight.  Plaintiff's cholesterol medications were adjusted.  Plaintiff was instructed to increase Toprol[29] and to add Altace.[30]  Dr. Waltrip discussed with plaintiff the indication of all medications, diet, walking, and exercise.  (Tr. 261.)

On October 14, 2003, plaintiff reported to Dr. Waltrip that she experienced discomfort with her cholesterol medications and that she was fatigued.  Plaintiff was instructed to diet.  Dr. Waltrip diagnosed plaintiff with low back pain but noted that plaintiff had no new myalgia.  (Tr. 260.)

Plaintiff returned to Dr. Lee on November 24, 2003, for follow up of her ulcerative colitis.  Plaintiff reported no change

_____

[29]Toprol XL is indicated for the treatment of hypertension and angina pectoris.  Physicians' Desk Reference 606 (55th ed. 2001).

[30]Altace is indicated for the treatment of hypertension. Physicians' Desk Reference 2067-68 (55th ed. 2001).

in her condition. Plaintiff reported having experienced one episode of diarrhea and blood which resolved after a few days. Dr. Lee opined that such occurrence was unlikely a recurrence of her ulcerative colitis. Plaintiff was instructed to return in August 2004 for follow up. (Tr. 201.)

On November 25, 2003, plaintiff reported to Dr. Waltrip that she had recently tripped on some stairs and had fallen to the ground. It was noted that plaintiff had fallen about three times during the previous year. (Tr. 259.)

On December 30, 2003, plaintiff reported to Dr. Waltrip that she had a bad left knee which causes constant pain. Plaintiff reported that she takes Tylenol. No edema was noted. Dr. Waltrip noted plaintiff's history of low back pain with bulging lumbar disc, as well as pain in plaintiff's knees. Dr. Waltrip recommended diet and exercise. (Tr. 258.)

Plaintiff returned to Dr. Waltrip on January 30, 2004, who continued in his diagnoses of osteoarthritis of the spine and knees. Dr. Waltrip noted Ultracet[31] to cause somnolence. Plaintiff was instructed to increase her dosages of Altace and Premarin,[32] and

---

[31]Ultracet is a combination medication containing narcotic analgesics and acetaminophen used to relieve moderate to moderately severe pain. Medline Plus (last revised July 1, 2005)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695011.html>.

[32]Premarin is a conjugated estrogen tablet. Physicians' Desk Reference 3429 (55th ed. 2001).

was started on Effexor.[33]  (Tr. 382.)

Plaintiff visited Dr. Waltrip on March 3, 2004, and reported that she had some pain in her right shoulder but that it was improving on its own.  Plaintiff reported being sleepy.  (Tr. 383.)

On March 29, 2004, plaintiff visited Dr. Waltrip and complained of pain in her right shoulder.  It was noted that plaintiff had pain along her clavicle upon raising her arm to eighty degrees and that the clavicle was tender with crossover.  It was noted that plaintiff had good internal and external rotation.  (Tr. 384.)

Plaintiff returned to Dr. Waltrip on April 2, 2004, who summarized plaintiff's relevant medical history relating to her back condition.  Dr. Waltrip noted that plaintiff continues to have constant severe low back pain, radiating down her left leg, with associated numbness and paresthesis.  Dr. Waltrip noted plaintiff's pain to be worse in the sitting area.  Dr. Waltrip also noted that past treatment with analgesics, muscle relaxants and physical therapy was ineffective.  Physical examination showed moderate limitations of all motions of the low back associated with pain and discomfort.  Straight leg raising was noted to cause back pain.

---

[33]Effexor is indicated for the treatment of depression and anxiety disorders and is sometimes used to treat hot flashes in women who have experienced menopause.  Physicians' Desk Reference 3361 (55th ed. 2001); Medline Plus (last revised Jan. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694020.html>.

Tenderness to palpation was noted in the low back and lumbar area with moderate muscle spasm. Plaintiff was unable to do toe-heel or tandem walking. (Tr. 356.) Straight line walking, heel-to-toe, was noted to be fair. ( Tr. 379.) Flexion of the neck reproduced left lumbar pain. It was noted that resting in the supine position somewhat relieved the pain. (Tr. 356.) Dr. Waltrip also noted hypertrophy of the knees and pain in the left knee. Apparent weakness of hip flexures was noted bilaterally. Dr. Waltrip identified conditions secondary to plaintiff's lumbar condition, including depression and obesity, and opined that such conditions may influence plaintiff's ulcerative colitis, acid reflux, hypertension, and cholesterol disorder. (Tr. 357.)

On this same date, April 2, 2004, Dr. Waltrip completed a Lumbar Spine Residual Functional Capacity Questionnaire at the request of plaintiff's attorney. (Tr. 351-55.) Dr. Waltrip identified plaintiff's symptoms as low back pain radiating down the left leg to the foot after sitting a long period of time, and that plaintiff experienced pain all of the time. Dr. Waltrip reported plaintiff's prognosis to be poor. (Tr. 352.) Dr. Waltrip reported swelling to be an objective positive sign of plaintiff's condition. (Tr. 352-53.) Dr. Waltrip opined that plaintiff's pain and symptoms would constantly interfere with plaintiff's attention and concentration during a typical workday. Dr. Waltrip reported that plaintiff could not walk any city blocks without resting or

experiencing severe pain.  (Tr. 353.)  Dr. Waltrip reported that plaintiff could not sit longer than forty-five minutes without needing to get up and could not stand longer than one hour without needing to reposition herself.  Dr. Waltrip reported that plaintiff could sit less than two hours and stand or walk about two hours in an eight-hour workday.  Dr. Waltrip reported that plaintiff would need to be able to walk every thirty minutes in an eight-hour workday for five minutes.  Dr. Waltrip reported that plaintiff would need to take unscheduled five or ten-minute breaks every hour during an eight-hour workday and must be able to shift at will between sitting, standing and walking.  Dr. Waltrip stated that plaintiff should elevate her legs during prolonged sitting and that, with sedentary work, her legs should be elevated fifty-percent of the time.  Dr. Waltrip opined that plaintiff could rarely lift and carry less than ten pounds and should never lift or carry any weight in excess of that amount.  (Tr. 354.)  Dr. Waltrip further opined that plaintiff should never twist, stoop, bend, crouch, or squat; and should only rarely climb ladders and stairs. Dr. Waltrip reported plaintiff to have significant limitations in reaching, handling and fingering.  Dr. Waltrip reported that plaintiff mainly has bad days with her condition and that plaintiff would likely be absent from work for more than four days each month on account of her condition or treatment therefor.  (Tr. 355.)  Dr. Waltrip noted plaintiff's pain to interfere with her sleep and

activities of daily living and opined that such pain would interfere with her ability to work. Dr. Waltrip further noted that, if she were to work, plaintiff would nevertheless experience side effects from her medications, including dizziness, drowsiness and stomach upset. Dr. Waltrip opined that plaintiff was totally and permanently disabled. (Tr. 357.)

Plaintiff visited Dr. Waltrip on May 4, 2004, and complained of pain in her right shoulder and in her hands. Plaintiff reported that she was sleepy. (Tr. 376.) X-rays were ordered of the right shoulder and left knee. (Tr. 377.)

An x-ray taken of plaintiff's right shoulder on May 11, 2004, in response to plaintiff's complaints of pain was negative. (Tr. 362.) An x-ray taken of plaintiff's left knee in response to plaintiff's complaints of pain showed minimal osteoarthritis. (Tr. 363.)

Plaintiff visited Dr. Waltrip on May 21, 2004, and reported that she had recently fallen and injured her feet and right shoulder. Plaintiff had full external range of motion of the shoulder. Plaintiff's shoulder was noted to be tender over the clavicle. No muscle spasms were noted. Plaintiff reported some tenderness along the lateral hip, with pelvic and hip pain. (Tr. 374.) Dr. Waltrip prescribed medication, including Bextra[34] and

_____

[34]Bextra is used to relieve the pain, tenderness, inflammation, and stiffness caused by arthritis. Medline Plus (last revised Oct. 1, 2005)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a602011.html>.

Vioxx.  Plaintiff was referred to Dr. Park and for physical therapy.  (Tr. 375.)

X-rays taken May 24, 2004, of plaintiff's right shoulder and clavicle were negative.  (Tr. 360-61.)

On June 23, 2004, plaintiff complained to Dr. Waltrip of low back pain, hip pain, knee pain, and of experiencing charley horses.  It was noted that plaintiff's knee was tender to touch, and plaintiff reported that it throbs.  (Tr. 371.)  Dr. Waltrip instructed plaintiff to continue with her medications and referred plaintiff to an orthopaedist for her knee pain.  (Tr. 373.)

On July 23, 2004, plaintiff underwent a neurological consult with Neurosurgeon Dr. Joel West Ray upon referral from Dr. Waltrip.  (Tr. 390-92.)  Plaintiff reported that her current symptoms wax and wane.  Plaintiff reported that she has pain in the left leg with increased left knee pain, tingling in her left calf, and muscle tightness in the thigh.  Plaintiff reported her symptoms to improve with sitting and to worsen with standing.  Plaintiff also reported left paralumbar pain with no weakness.  (Tr. 390.)  Plaintiff stated that with activity, her pain is at a level eight on a scale of one-to-ten.  At rest, plaintiff stated her pain to be at a level one.  (Tr. 391.)  Dr. Ray noted plaintiff's current medications to include Altoprev,[35] Nortriptyline, Altace,

_____

[35]Altoprev is used to reduce the amount of cholesterol and other fatty substances in the blood.  Medline Plus (last revised July 1, 2006)<http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a688006.html>.

Hydrochlorothiazide,[36] Effexor, and Toprol XL. (Tr. 392.) Physical examination showed plaintiff's muscle strength to be 5/5. Plaintiff had no decreased sensation or spasms to palpation. Tenderness was noted about the left paralumbar region. Straight leg raising was negative. Heel and toe walking was deferred secondary to pain. Dr. Ray determined for plaintiff to try aquatics therapy. An MRI scan was ordered and plaintiff was instructed to return in four to six weeks. (Tr. 391.)

Plaintiff visited Dr. Waltrip on August 3, 2004, and complained of back pain and knee pain. It was noted that plaintiff was participating in physical therapy and that plaintiff's orthopaedist determined to try therapy before considering surgery for plaintiff's condition. Plaintiff reported Effexor to be working well, and plaintiff's mood was noted to be stable and good. (Tr. 369.) Plaintiff was instructed to continue with her medications. (Tr. 370.)

Plaintiff returned to Dr. Ray on September 1, 2004. (Tr. 388-89.) Dr. Ray noted an MRI performed July 30, 2004, to show modest disc bulge at L5-S1 which appeared to narrow the lateral recesses bilaterally in conjunction with hypertrophy, with the left lateral recesses appearing narrowed more than the right. No evidence of canal or foraminal stenosis was noted at other levels. Dr. Ray noted plaintiff to have been compliant with her physical

---

[36]HCTZ (Hydrochlorothiazide) is indicated for the treatment of hypertension. Physicians' Desk Reference 2417-18 (55th ed. 2001).

therapy regimen and to have worked very hard, but that the therapist had reported no significant decrease in plaintiff's pain. Flexibility and body mechanics had improved, however. (Tr. 388.) Dr. Ray opined that plaintiff should obtain improvement with nonsurgical management and determined to refer plaintiff to a pain clinic to see if she could obtain relief with injections. Plaintiff was instructed to continue with physical therapy. Dr. Ray determined not to prescribe anti-inflammatory medication given plaintiff's difficult history with such on account of her colitis. Plaintiff was instructed to return in four to six weeks for follow up. (Tr. 389.)

Plaintiff returned to Dr. Waltrip on September 2, 2004, and reported that she performs pool exercises and that her symptoms worsen in the pool. Dr. Waltrip noted that plaintiff could bend to the floor with no pain. No numbness was noted. Plaintiff reported that she experiences pain down the left leg, that she has problems with her left knee, and that she cannot sleep on her left side. It was noted that plaintiff was participating in therapy and that referral to a pain clinic had been considered. Administration of an injection to the knee was discussed. (Tr. 367.)

Plaintiff visited Dr. Waltrip on October 5, 2004, and reported that she had been light headed, was experiencing a burning sensation in her chest, and that her heart had been racing. It was noted that plaintiff had recently been under a lot of stress. (Tr.

365.)

On October 29, 2004, plaintiff returned to Dr. Ray for follow up. (Tr. 386-87.) Dr. Ray noted plaintiff to have had a significant decrease in her pain with combination injection and physical therapy. Plaintiff reported her pain rating to have dropped to one from five on a scale of one-to-ten. Plaintiff reported her leg pain to have been completely relieved but that she had some occasional low back symptoms. Plaintiff reported feeling able to be more active. (Tr. 386.) Dr. Ray noted plaintiff's physical therapists to have recommended that plaintiff be discharged from therapy and that she continue with a home exercise program. (Tr. 386-87.) Dr. Ray determined to discharge plaintiff from his care back to the care of Dr. Waltrip. Plaintiff was instructed to advise Dr. Waltrip if she needed additional injections at the pain clinic, and that Dr. Waltrip would make such arrangements if so needed. Plaintiff was instructed to return to Dr. Ray on an as needed basis. (Tr. 387.)

Plaintiff visited Dr. Waltrip on November 10, 2004, and reported that she had no pain and that she planned to "keep from hurting." Plaintiff reported that she had recently helped a friend put together a computer cabinet, upon which her left knee began to hurt. Dr. Waltrip noted plaintiff's mood to be good. (Tr. 364.)

### IV.  The ALJ's Decision

The ALJ found plaintiff to have been insured for a Period

of Disability and Disability Insurance Benefits since October 27, 1999, and to remain insured through the date of the decision. The ALJ found that plaintiff had not engaged in substantial gainful activity since October 27, 1999. The ALJ found plaintiff's degenerative disc disease and left-sided plantar fasciitis to be severe impairments, but that such impairments did not meet or medically equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ also found plaintiff's allegations not to be credible. The ALJ found that since October 27, 1999, plaintiff has had the residual functional capacity (RFC) to lift, carry, push, or pull ten pounds occasionally and less than ten pounds frequently; to sit six hours in an eight-hour workday; and to stand or walk a total of two hours in an eight-hour workday. The ALJ found plaintiff unable to perform her past relevant work. Considering plaintiff's age, education and RFC, the ALJ applied Medical-Vocational Rule 201.21 and found plaintiff able to perform work existing in significant numbers in the national economy since October 27, 1999. The ALJ therefore determined plaintiff not to be disabled since October 27, 1999, and disability benefits were denied. (Tr. 17-18.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits under the Social Security Act, plaintiff must prove that she is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th

Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).   The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).   An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 423(d)(2)(A).

        To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.   See 20 C.F.R. § 404.1520; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.   If the claimant is working, disability benefits are denied.   Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.   If the claimant's impairment(s) is not severe, then she is not disabled.   The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the

- 44 -

impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional

activities and impairments.

5.    Any corroboration by third parties of the plaintiff's impairments.

6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence.  Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068(8th Cir. 2000)).  A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome.  Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole and, specifically, that the ALJ erred in finding plaintiff able to perform a full range of sedentary work without having first obtained vocational expert testimony regarding plaintiff's physical and mental limitations.  Plaintiff also claims that the ALJ erred in his determination to accord slight weight to the opinion of plaintiff's

treating physician, Dr. Waltrip.

A.    Lack of Vocational Expert Testimony

      In his written decision, the ALJ determined that plaintiff could not perform her past relevant work but nevertheless retained the RFC to perform a full range of sedentary work.[37] Considering plaintiff's age, education, work experience, and her RFC to perform sedentary work, the ALJ relied on the Medical-Vocational Guidelines and determined plaintiff not to be disabled. Plaintiff claims, however, that the ALJ should have obtained the testimony of a vocational expert regarding plaintiff's mental and physical limitations and that the failure to do so resulted in the Commissioner's failure to meet his burden of demonstrating that plaintiff could perform other work in the national economy.  For the following reasons, plaintiff's argument is well taken.

      Where an ALJ determines that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to show that there are other jobs that the claimant is capable of performing.  Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993). If the claimant suffers from only exertional impairments, this burden may be met by reference to the Medical-Vocational Guidelines

---

[37]Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  20 C.F.R. § 404.1567(a).

(Guidelines). <u>Bolton v. Bowen</u>, 814 F.2d 536, 537 n.3 (8th Cir. 1987). Use of the Guidelines is also permissible where a non-exertional impairment is found to exist "provided that the ALJ finds, and the record supports the finding, that the non-exertional impairment does not significantly diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." <u>Harris v. Shalala</u>, 45 F.3d 1190, 1194 (8th Cir. 1995) (citing <u>Thompson v. Bowen</u>, 850 F.2d 346, 349-50 (8th Cir. 1988)). <u>See also</u> <u>Bolton</u>, 814 F.2d at 537-38. The burden is on the ALJ to demonstrate that the use of the Guidelines is proper. <u>Lewis v. Heckler</u>, 808 F.2d 1293, 1298 (8th Cir. 1987).

Where a non-exertional impairment significantly diminishes the claimant's residual functional capacity, the Guidelines are not controlling and the ALJ must call a vocational expert or produce other similar evidence to establish that there are jobs available in the national economy for a person with the claimant's abilities. <u>Harris</u>, 45 F.3d at 1194; <u>Sanders v. Sullivan</u>, 983 F.2d 822, 823 (8th Cir. 1992); <u>Thompson v. Bowen</u>, 850 F.2d 346, 350 (8th Cir. 1988). The Eighth Circuit has provided some guidance in applying this standard:

> In this context "significant" refers to whether the claimant's non-exertional impairment or impairments preclude the claimant from engaging in the full range of activities listed in the Guidelines under the demands of day-to-day life. Under this standard isolated occurrences will not

> preclude use of the Guidelines, however
> persistent non-exertional impairments which
> prevent the claimant from engaging in the full
> range of activities listed in the Guidelines
> will preclude the use of the Guidelines to
> direct a conclusion of disabled or not
> disabled. For example, an isolated headache
> or temporary disability will not preclude the
> use of the Guidelines whereas persistent
> migraine headaches may be sufficient to
> require more than the Guidelines to sustain
> the [Commissioner's] burden.

Thompson, 850 F.2d at 350.

Plaintiff argues here that she suffers from non-exertional limitations both physically and mentally and that such non-exertional limitations precluded the ALJ's exclusive use of the Guidelines in determining plaintiff not to be disabled. Because a review of the ALJ's decision shows him to have failed to properly consider plaintiff's pain as a non-exertional impairment, the ALJ erred in his determination to rely solely on the Guidelines to determine plaintiff not to be disabled.

The ALJ found plaintiff's subjective complaints of disabling pain not to be credible. Plaintiff does not dispute this finding. "However, the fact that the claimant's pain is not so severe as to be disabling does not necessarily mean that it places no limits or restrictions on [her] ability to work." Baker v. Apfel, 159 F.3d 1140, 1145 (8th Cir. 1998).

> Pain may be a nonexertional factor to be
> considered in combination with exertional
> limitations as well as a separate and

> independent ground for disability. Where pain
> is considered as a separate ground for
> disability, of course, it must be severe
> enough to prevent the claimant from engaging
> in *any* substantial gainful employment. Where
> pain is considered in combination with
> exertional limitations, however, it need only
> be found significant enough to prevent the
> claimant from engaging in the full range of
> jobs contemplated by the exertional category
> for which the claimant otherwise qualifies.

Kirksey v. Heckler, 808 F.2d 690, 693 (8th Cir. 1987) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1148 (8th Cir. 1982)).

Here, although the ALJ found plaintiff's pain not to be disabling, he did not engage in any discussion nor make any specific finding that plaintiff's pain, as a non-exertional limitation, did not significantly compromise plaintiff's capacity to engage in sedentary work. Without such a finding, it cannot be said that the Commissioner met his burden of demonstrating that reliance on the Guidelines in finding plaintiff not to be disabled was appropriate. Lewis, 808 F.2d at 1298.

To the extent plaintiff claims that her mental limitations likewise precluded use of the Guidelines, plaintiff argues only that a vocational expert should have been called to testify as to the effect of plaintiff's mental ability to perform work, given plaintiff's IQ score of 73 and special education classes. A review of the record shows plaintiff to have obtained an IQ score of 73 in 1966, thirty-eight years prior to the administrative hearing in this cause when plaintiff was in the

fourth grade, and to have participated in special education classes that same school year. (Tr. 71, 75.) Plaintiff's application for disability benefits did not allege a mental impairment, however. Nor did the issue arise at plaintiff's hearing before the ALJ. In addition, plaintiff's counsel did not raise the issue in his brief to the Appeals Council. Although the undersigned is aware that an ALJ has an obligation to develop an adequate record, the ALJ cannot be faulted here for failing to pursue <u>sua</u> <u>sponte</u> an issue regarding plaintiff's intellectual functioning based only on this antiquated piece of information, especially given plaintiff's many years of satisfactory work as an adult. <u>See</u> <u>Brockman v. Sullivan</u>, 987 F.2d 1344, 1348 (8th Cir. 1993). <u>Cf.</u> <u>Battles v. Shalala</u>, 36 F.3d 43, 45 (8th Cir. 1994) (evidence before ALJ was sufficient to raise issue as to claimant's mental and psychological capacity); <u>Highfill v. Bowen</u>, 832 F.2d 112, 115 (8th Cir. 1987) (evidence "put the ALJ on notice of the need for further inquiry").

Nevertheless, as discussed above, the record supports a finding that plaintiff suffers from pain, a non-exertional impairment. Although the pain may not be severe enough to be disabling, plaintiff is nevertheless entitled to have a vocational expert testify as to the effect this impairment has on her RFC. <u>Baker</u>, 159 F.3d at 1145; <u>see also</u> <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1060 (8th Cir. 1998); <u>Hunt v. Heckler</u>, 748 F.2d 478, 480-81 (8th Cir. 1984). Accordingly, this cause should be remanded to the

Commissioner for appropriate consideration of plaintiff's pain as a non-exertional impairment and to consult and obtain testimony from a vocational expert as to whether there is work in the national economy that a person with plaintiff's exertional and non-exertional impairments can perform. <u>Sanders</u>, 983 F.2d at 824.

B.    <u>Opinion of Treating Physician</u>

Plaintiff also claims that the ALJ erred in giving only slight weight to the opinion of plaintiff's treating physician, Dr. Waltrip, and that the reasons given for discounting Dr. Waltrip's opinion are not supported by the record.

In April 2004, Dr. Waltrip completed an RFC questionnaire regarding plaintiff's functional limitations caused by her impairments. With this questionnaire, Dr. Waltrip also submitted a narrative explanation of plaintiff's relevant medical and treatment history and his opinion of plaintiff's inability to engage in any work activity. In his written decision, the ALJ determined to accord slight weight to Dr. Waltrip's opinions as expressed in April 2004:

> [T]hese opinions are given slight weight for
> several reasons. First, the limitations are
> so great as to impart exaggeration. Second,
> the opinions are internally inconsistent in
> multiple respects. That is, the doctor noted
> that the claimant could not walk any distance
> without experiencing pain or needing rest, but
> then noted that the claimant needed to walk
> for five minutes every thirty minutes.
> Despite the purported limitation in walking,
> he further noted that the claimant did not

> require an assistive device to walk. He noted
> that the claimant could not walk heel-to-toe,
> but his April 2004 treatment note--the note
> being of the same date as the opinions--shows
> that the claimant had a fair ability to walk
> heel-to-toe. And he noted that the claimant
> had a positive straight leg raise test, but
> his treatment notes consistently show that the
> claimant had non-focal neurological results.
> Third, the opinions are inconsistent with the
> medical record as a whole . . . . The
> doctor's report that physical therapy had been
> ineffective is grossly inconsistent with the
> medical record. Fourth, the opinions are
> inconsistent with other evidence of record,
> particularly the claimant's activities of
> daily living[.]

(Tr. 14-15.) (Citations to the record omitted.)

The Regulations require the Commissioner to give more weight to the opinions of treating physicians than other sources. 20 C.F.R. § 404.1527(d)(2). A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Id.; see also Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the
> medical professionals most able to provide a
> detailed, longitudinal picture of [a
> claimant's] medical impairment(s) and may
> bring a unique perspective to the medical
> evidence that cannot be obtained from the

> objective medical findings alone or from
> reports of individual examinations, such as
> consultative examinations or brief
> hospitalizations.

20 C.F.R. § 404.1527(d)(2).

Opinions of treating physicians do not automatically control in determining disability, however, inasmuch as the Commissioner is required to evaluate the record as a whole. <u>Charles v. Barnhart</u>, 375 F.3d 777, 783 (8th Cir. 2004). When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion. 20 C.F.R. § 404.1527(d)(2). Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. <u>Id.</u> The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." <u>Id.</u>

In this cause, the ALJ determined to accord slight weight to Dr. Waltrip's opinions as rendered in the April 2004 RFC questionnaire because of internal inconsistencies as well as inconsistencies with other evidence in the record. As set out

below, the ALJ on remand should revisit the weight given to Dr. Waltrip's opinions and the reasons given therefor.

       1.   *Internal Inconsistencies*

The ALJ first states that Dr. Waltrip's RFC assessment is internally inconsistent in that "the doctor noted that the claimant could not walk any distance without experiencing pain or needing rest, but then noted that the claimant needs to sure for five minutes every thirty minutes." (Tr. 14.) Dr. Waltrip's observation is not inconsistent. A review of Dr. Waltrip's report, as well as the medical record in its entirety, shows that plaintiff experienced pain while walking, standing or sitting. At or around the time of Dr. Waltrip's assessment, however, plaintiff experienced the greatest pain while sitting. Because of this pain while stationary, a medical opinion that plaintiff would need to walk for five minutes every thirty minutes is not inconsistent with a finding that plaintiff experiences pain while walking. While walking may cause plaintiff pain, it appears from the record that failure to so walk would cause plaintiff to experience even greater pain.

The ALJ also found Dr. Waltrip's opinion that plaintiff would not need an assistive device to be inconsistent with plaintiff's walking limitations. The medical evidence of record, however, demonstrates that plaintiff's limitations in walking are caused by radiating pain resulting from degenerative disc disease

in plaintiff's back, rather than by instability in plaintiff's lower extremities for which an assistive device would be needed. See, e.g., Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir. 2004) (fact that claimant did not need assistive device to walk is no reason to reject claims of pain, especially when claims are supported by medical reports); cf. Brown ex rel. Williams v. Barnhart, 388 F.3d 1150 (8th Cir. 2004) (ALJ properly considered lack of need for assistive device on claim that foot drop, weakness in leg and atrophy of the calf muscle limited claimant's ability to walk).

The ALJ further identified as an additional internal inconsistency that Dr. Waltrip "noted that the claimant could not walk heel-to-toe, but his April 2004 treatment note––this note being of the same date as the opinions––shows that the claimant had a fair ability to walk heel-to-toe." (Tr. 14-15.) In his treatment notes, Dr. Waltrip observed on April 2, 2004, that plaintiff's straight line walking was fair, heel to toe. In the narrative accompanying his April 2004 RFC questionnaire, however, Dr. Waltrip did *not* state, as asserted by the ALJ, that plaintiff could not walk heel-to-toe, but rather that plaintiff was "unable to do toe-heel . . . walking." (Tr. 356.) This actual statement of Dr. Waltrip most likely refers to plaintiff's inability to walk on her toes or to walk on her heels inasmuch as a thorough review of all of Dr. Waltrip's notes shows him to have tested plaintiff

for her ability to walk on her toes and on her heels throughout his treatment of her. (Tr. 292, 293, 300.) Indeed, a review of the record shows that such a test was deferred in July 2004 because of plaintiff's pain. (Tr. 391.) See also 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(E)(1) (a claimant's "[i]nability to walk on the heels or toes" during physical examination for musculoskeletal disorder of the spine may evince significant motor loss). As such, it cannot be said that this "toe-heel" statement, mischaracterized by the ALJ, constitutes substantial evidence upon which the ALJ could discredit the opinion of this treating physician.

2.  *Other Evidence*

The ALJ also determined to accord little weight to Dr. Waltrip's April 2004 opinions because of their inconsistencies with other evidence in the record. First, the ALJ determined to discredit Dr. Waltrip's statement that plaintiff had positive straight leg raising, finding such statement to be inconsistent with his own treatment notes which "consistently show[ed] that the claimant had non-focal neurological results." (Tr. 15.) Inasmuch as straight leg raising is a test of the musculoskeletal system, see 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 1.00(E)(1), 1.04(A); and "non-focal neurological results" reflect an observation as to the existence of problems with the brain or nervous system, see *Focal Neurological Deficits*, Medline Plus (updated Feb. 15, 2005)<http://www.nlm.nih.gov/medlineplus/ ency/article/003191.htm>,

the report of a positive musculoskeletal test is not necessarily inconsistent with negative neurological findings. The ALJ's misapprehension as to the nature of these examinations and observations cannot constitute good reason to discredit a treating physician's opinion.

The ALJ also discredited Dr. Waltrip's observation that physical therapy had been ineffective, finding such observation to be "grossly inconsistent with the medical record." (Tr. 15.) A review of the record in its entirety shows that subsequent to her back surgery in October 1999 and prior to Dr. Waltrip's April 2004 assessment, plaintiff participated in one round of physical therapy for her back condition in September 2002 which resulted in a reduction of back pain and recovery of motion as observed by Dr. Tellow on September 30, 2002. However, between September 30, 2002, and April 2004, plaintiff continued to be diagnosed with back pain, bulging lumbar disc, degenerative disc disease, and osteoarthritis; and had been prescribed various medications for pain, including narcotic and opioid agents, and ultimately was prescribed medication for chronic pain. While the record may support a finding that physical therapy provided relief for plaintiff, a review of the entire record shows such relief to have been short lived and that the various modalities used to treat plaintiff's condition were ineffective in providing long term relief. As such, it cannot be said that Dr. Waltrip's statement that physical

therapy had proven to be ineffective for plaintiff was "grossly inconsistent" with the medical record.

Where a treating physician renders inconsistent opinions, the credibility of such opinions is undermined and an ALJ may disregard or diminish the weight given to them. <u>Hacker v. Barnhart</u>, 459 F.3d 934, 937 (8th Cir. 2006); <u>Reed v. Barnhart</u>, 399 F.3d 917, 920-21 (8th Cir. 2005); <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1013 (8th Cir. 2000). In this cause, however, the ALJ determined to discount the opinions of plaintiff's treating physician by citing certain perceived inconsistencies where they did not exist. As such, these "inconsistencies" are not sufficient to constitute good reasons for the ALJ to accord slight weight to the treating physician's opinions. 20 C.F.R. § 404.1527(d)(2); <u>Reed</u>, 399 F.3d at 921.

However, the ALJ also found Dr. Waltrip's opinions to be inconsistent with plaintiff's daily activities as a daycare provider as she reported them to be in December 2003. (Tr. 15, 113-14.) Discounting a treating physician's opinion as to a claimant's limitations where such opinion is inconsistent with the claimant's daily activities is not error. See <u>Goff v. Barnhart</u>, 421 F.3d 785, 790-91 (8th Cir. 2005); <u>Tellez v. Barnhart</u>, 403 F.3d 953, 956 (8th Cir. 2005). Specifically, the ALJ determined the limitations as stated by Dr. Waltrip to be inconsistent with plaintiff's self-reported activities of watching up to eight

children, preparing meals for them, feeding them, washing their dishes, changing their diapers or clothing, playing games with and reading to them, taking them to their appointments, and frequently lifting and carrying them. (Tr. 15.) Such activities, as reported by plaintiff herself in December 2003, are at odds with the extreme limitations described by Dr. Waltrip in April 2004 and thus, on their face, appear to provide some support for the ALJ's discounting of Dr. Waltrip's opinion. However, when viewed in the light of the ALJ's several misapprehensions of the record in his overall determination to accord little weight to Dr. Waltrip's opinion, doubt is nevertheless cast upon the ALJ's ultimate conclusion to discount the opinion of this treating physician. See Baumgarten v. Chater, 75 F.3d 366, 369-70 (8th Cir. 1996). This is especially true here where, as set out above, the record shows plaintiff to have obtained only intermittent relief from her chronic back condition, that she experienced an exacerbation of the condition subsequent to December 2003, and that evidence shows that plaintiff discontinued the activities which she described in December 2003 because of her physical inability to continue to engage in such activities.

Accordingly, on remand, the Commissioner should review the entire record and reevaluate the weight given to the opinions of plaintiff's treating physician, including his opinion as to specific limitations placed upon plaintiff as a result of her

medically diagnosed condition. In the event controlling weight is not accorded to such opinions, the Commissioner must give good, legally sufficient reasons for the weight given with such reasons to be supported by substantial evidence on the record as a whole. If the Commissioner properly discredits Dr. Waltrip's opinions upon remand, the Commissioner may be compelled to more fully develop the record as to plaintiff's functional abilities inasmuch as no other evidence thereof appears in the record as it now stands. The Commissioner may seek additional opinions from plaintiff's treating physicians or, in the alternative, order consultative examinations to properly assess plaintiff's physical residual functional capacity. See Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

## VI. Conclusion

For all of the foregoing reasons, the grounds underlying the ALJ's determination to accord slight weight to the opinion of plaintiff's treating physician regarding plaintiff's exertional limitations are insufficient to constitute good reasons to discount such opinion. In the absence of appropriate consideration given to the opinion of plaintiff's treating physician and the lack of other evidence regarding plaintiff's functional abilities, it cannot be said that the ALJ's RFC determination is supported by substantial evidence on the record as a whole. In addition, because the ALJ failed to properly consider plaintiff's pain as a non-exertional impairment, the ALJ's determination that plaintiff could perform a

full range of sedentary work without obtaining testimony from a vocational expert was error. Therefore, the undersigned determines the Commissioner's decision not to be based upon substantial evidence on the record as a whole and the cause should be remanded to the Commissioner for further consideration. Because the current record does not conclusively demonstrate that plaintiff is entitled to benefits, it would be inappropriate for the Court to award plaintiff such benefits at this time.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Michael J. Astrue, Commissioner of Social Security, be substituted for Former Commissioner Jo Anne B. Barnhart as proper party defendant in this cause.

**IT IS FURTHER RECOMMENDED** that the decision of the Commissioner be reversed and that this cause be remanded to the Commissioner for further proceedings.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **February 26, 2007.** Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).



—————————————————————
UNITED STATES MAGISTRATE JUDGE

Dated this <u>_14th_</u> day of February, 2007.